**ELK RIVER, INC., Appellant,**

v.

**GARRISON TOOL & DIE, LTD., Appellee.**

**529900 Ontario Limited a/k/a Niagara Safety Products, Appellant,**

v.

**Elk River, Inc. and Hortencia Wardlow, Individually and as Heir and Personal Representative For the Estate of and as Wrongful Death Beneficiary of Carlos Juaquin Munoz, Decedent, Appellees.**

No. 05–06–00158–CV.

Court of Appeals of Texas, Dallas.

March 29, 2007.

Rehearing Overruled May 15, 2007.

---

Kenneth R. Baird, Michael D. Williams, Brown Sims, P.C., Michael W. Magee, Hays Mcconn Rice & Pickering, Houston, Thomas W. Fee, Fee, Smith, Sharp & Vitullo, John S. Kenefick, Macdonald Devin, P.C., Dallas, for Appellee.

Before Justices FITZGERALD, RICHTER, and FRANCIS.

## OPINION

Opinion by Justice FRANCIS.

Appellants Elk River, Inc. and 529900 Ontario Limited a/k/a Niagara Safety Products (Niagara) appeal the trial court's order resolving two special appearances. In three issues, Elk River, Inc. contends the trial court erred in granting appellee Garrison Tool & Die, Ltd.'s special appearance because the trial court had personal jurisdiction and exercising it comports with traditional notions of fair play and substantial justice. In a single issue, Niagara contends the trial court erred in denying Niagara's own special appearance. We affirm.

Garrison and Niagara are Canadian limited companies with principal places of business a few miles apart in Fort Erie, Ontario, Canada. Garrison manufactures components for fall safety equipment. Niagara operates as a commissioned sales force distributing the products of fall safety equipment manufacturers. Garrison sells a small portion of its products directly to Miller Equipment in Pennsylvania. Otherwise, Garrison consigns its entire production to Niagara for sale under an oral agreement. The two companies have no corporate relationship, and Niagara sells its own products and the products of other companies as well. Neither Garrison nor Niagara has ever had an office, employees, a registered agent, or a bank account in Texas.

Debra Ibarra Mayfield and Nathan M. Rymer, Rymer, Moore, Jackson & Echols, P.C., Houston, Rudy Gonzales, Jr., Law Offices of Gonzales, Hoblit, Ferguson, L.L.P., Corpus Christi, for Appellant.

The underlying negligence and products liability suit arises from the June 16, 2003 death of Carlos Juaquin Munoz in Goehner, Nebraska. Munoz died after falling 1,200 feet from a broadcast tower owned by Spectrasite Communications, Inc., a Texas corporation. At the time of his death, Munoz was working on the tower for his employer, Doty–Moore Tower Services, Inc., a Texas corporation with principal place of business in Dallas County, Texas.

The plaintiff below, appellee Hortencia Wardlow, is Munoz's mother. In her suit, Wardlow alleges Munoz died because a safety harness securing him to the tower failed. Munoz's safety harness included a Garrison model GL 3100 hook described as a "pelican hook" or "ladder hook." Wardlow alleges Niagara sold the hook to Elk River, an Alabama-based component distributor, which then sold the hook to Trinity Sling Authority, Inc., a Texas corporation. Trinity Sling allegedly assembled the hook and other components into a safety harness or "positioning lanyard" which it allegedly sold to Doty–Moore.

Wardlow sued Doty–Moore, Spectrasite, Trinity Sling, and Elk River. After Elk River filed a third-party complaint against Garrison and Niagara for contribution and indemnity, Wardlow amended her pleadings to add the Canadian defendants.

Garrison and Niagara filed special appearances to contest the trial court's personal jurisdiction over them. After conducting a hearing, the trial court found (1) Niagara sells Garrison's products all over the United States, including Texas; (2) Garrison did not exercise any control over Niagara's selection of customers or geographic markets to serve; and (3) Niagara advertises in Texas through a catalog, talks to Texas customers, and intends to serve the Texas market. In contrast, the trial court found Garrison does not advertise or market its products in Texas.

The trial court concluded it did not have personal jurisdiction over Garrison. The trial court concluded Niagara's sale of the hook to Elk River in Alabama did not create a sufficient nexus between the litigation and the State of Texas for specific jurisdiction over Garrison even if it was foreseeable that Elk River might sell a completed positioning lanyard to a Texas corporation. The trial court further concluded Garrison had not attempted to service the Texas market, and Niagara was not Garrison's agent. Ultimately, the trial court concluded, "Garrison's contacts with the State of Texas do not rise to the level of continuous and systematic and are too shadowy and thin to support the exercise of general jurisdiction."

The trial court concluded it did not have specific jurisdiction over Niagara but it did have general jurisdiction because Niagara was doing business in Texas and had established continuous and systematic minimum contacts with Texas. As evidence of continuous and systematic contacts, the trial court cited Niagara's business activity and sales in Texas, its advertising and marketing of products in Texas, its communications and solicitations aimed at Texas customers, and its "sufficiently interactive" website.

The trial court concluded the exercise of general jurisdiction over Niagara does not offend traditional notions of fair play and substantial justice because of the minimum contacts it found. Further, the trial court concluded Niagara's attendance at industry conferences and its in-person sales calls showed the burden of defending the lawsuit would be minimal. The trial court concluded the State of Texas has a strong interest in protecting its citizens and compensating them for injuries resulting from defective products, in regulating the quality of products in the State's stream of

commerce, and in adjudicating this dispute.

■ Whether a court has personal jurisdiction over a nonresident defendant is a question of law. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 805–06 (Tex.2002). To resolve this question of law, the trial court frequently must resolve preliminary questions of fact. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). The trial court's fact findings may be reviewed for legal and factual sufficiency. *Id.* The trial court's conclusions of law are subject to de novo review. *See id.*

In this case, Elk River challenges the factual sufficiency of the evidence supporting some of the trial court's findings while Niagara challenges the findings on both legal and factual sufficiency grounds. Both appellants request de novo review of the trial court's conclusions of law.

In reviewing findings for legal sufficiency, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). We uphold the findings against a legal sufficiency challenge if more than a scintilla of evidence supports them. *Hoffmann v. Dandurand,* 180 S.W.3d 340, 345 (Tex.App.-Dallas 2005, no pet.). In assessing the factual sufficiency of the evidence, we consider all of the evidence presented and reverse only if the findings are so against the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Id.* Unchallenged findings of fact are binding on appeal. *Hotel Partners v. KPMG Peat Marwick,* 847 S.W.2d 630, 632 (Tex.App.-Dallas 1993, writ denied). If we determine the trial court reached an erroneous conclusion of law, the error does not require reversal if the trial court reached the proper judgment. *Welborn Mortgage Corp. v.*

*Knowles,* 851 S.W.2d 328, 332 (Tex.App.-Dallas 1993, writ denied).

■ The long-arm statute authorizes Texas courts to exercise jurisdiction over nonresident defendants doing business within the State. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). The long-arm statute reaches as far as possible consistent with federal constitutional guarantees of due process of law. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). An exercise of personal jurisdiction over a nonresident defendant is consistent with federal due process requirements if (1) the defendant has established minimum contacts with Texas, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BMC Software,* 83 S.W.3d at 795.

■ In evaluating the extent of the defendant's contacts with Texas, the touchstone of our jurisdictional analysis is "purposeful availment." *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). In determining whether the defendant has purposefully availed itself of the privilege of conducting activities within Texas, we look only to the defendant's contacts and not unilateral contacts of third parties. *See id.* at 784–85. We examine only purposeful contacts of the defendant itself that are not random, isolated, or fortuitous. *Id.* at 785. We search for evidence showing the defendant availed itself of the forum by seeking some benefit, advantage, or profit. *Id.* When a foreign defendant is involved, the minimum contacts analysis is particularly important because of the unique and onerous burdens placed on a party called to defend itself in a foreign legal system. *See BMC Software,* 83 S.W.3d at 795.

A nonresident defendant's minimum contacts may result in either general or specific personal jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *BMC Software,* 83 S.W.3d at 795–96. General jurisdiction exists if the defendant has established continuous and systematic contacts with Texas. *BMC Software,* 83 S.W.3d at 796. Specific jurisdiction arises when the nonresident defendant has established minimum contacts by purposefully availing itself of the privilege of conducting activities in Texas and its liability arises from or is related to those contacts. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 575, 2007 WL 623805, at *4 (Tex. 2007).

In considering whether the exercise of jurisdiction over a foreign defendant in an international dispute comports with traditional notions of fair play and substantial justice, we consider (1) the burden on the nonresident defendant, (2) the forum state's interest in adjudicating the dispute, and (3) the plaintiff's interest in obtaining the most efficient resolution of controversies. *Guardian Royal,* 815 S.W.2d at 232 & n. 17. We must also consider the procedural and substantive policies of other nations whose interests are affected by the assertion of the court's jurisdiction. *Id.* at 228. Those interests, as well as the Federal Government's interest in its foreign relations policies, are best served by careful inquiry into the reasonableness of the court asserting jurisdiction in the case and an unwillingness to impose the serious burden of international litigation on an alien defendant where the forum State's interest is minimal. *Id.* at 228–29.

The plaintiff bears the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the long-arm statute. *BMC Software,* 83 S.W.3d at 793. Once the plaintiff meets its burden, a nonresident defendant challenging personal jurisdiction through a special appearance bears the burden to negate all bases of personal jurisdiction. *Id.*

In its first issue, Elk River contends the trial court erred in granting Garrison's special appearance because Garrison's continuous and systematic contacts with the State of Texas subject it to general jurisdiction. Elk River asserts Garrison placed the hook into the "stream of commerce" with the reasonable expectation some hooks would reach the Texas market, advertised and marketed its products to Texas customers, and employed Niagara as its agent in the State. Elk River challenges for factual sufficiency the trial court's findings that Garrison does not exercise any control over Niagara's selection of customers or geographic markets, that Garrison is not sure what percentage of its products are sold to entities in Texas, and that Garrison does not advertise or market its products in the State of Texas. Elk River seeks review of the trial court's conclusions of law that (1) Garrison has not made an attempt to service the Texas market, (2) there is no agency relationship between Garrison and Niagara, (3) Niagara's Texas contacts should not be imputed to Garrison, and (4) Garrison's contacts with Texas "do not rise to the level of continuous and systematic and are too shadowy and thin to support the exercise of general jurisdiction." We conclude the great weight and preponderance of the evidence supports the trial court's findings, and its legal conclusions are not erroneous.

Phillip Watts, Garrison's corporate representative, admitted when deposed that Garrison manufactured the GL 3100 hooks, delivered them on consignment to Niagara, and reasonably expected Niagara would sell some of the hooks to Texas customers.

Because Garrison delivered the hooks into the "stream of commerce" with the reasonable expectation they would enter Texas, Elk River asserts Garrison did attempt to service the Texas market and its contacts exceed the threshold to invoke the trial court's general jurisdiction.

■■■■ The "stream of commerce" doctrine provides a basis for personal jurisdiction in products liability suits when a manufacturer or distributor, seeking to serve the markets of other States, has "delivered its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The doctrine permits suit within a particular forum when "allegedly defective merchandise has *there* been the source of injury to its owner or to others." *Id.* at 297–98 (emphasis added).

■■■■ The "stream of commerce" doctrine does not establish general jurisdiction in the forum State. *See Alpine View Co., Ltd. v. Atlas Copco AB,* 205 F.3d 208, 216 (5th Cir.2000); *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 375 (5th Cir. 1987). *See also Moki Mac,* 221 S.W.3d at 583, 2007 WL 623805, at *11 (disapproving of efforts to blur the distinction between general and specific jurisdiction). Because the accident in question occurred in Nebraska, we cannot agree with appellant that merely placing the hook into the stream of commerce in Canada subjects Garrison to general jurisdiction in Texas. *See Bearry,* 818 F.2d at 375.

Elk River contends that in addition to placing the hooks into the stream of commerce, Garrison established continuous and systematic contacts with Texas in other ways. Elk River asserts Garrison's effort to advertise its products in Texas independently satisfies the due process requirements to establish general jurisdiction. Elk River further asserts Garrison designed the hook for the market in Texas, marketed the product through Niagara, and sent employees to safety industry conferences in Dallas to assess the Texas market.

Niagara does not advertise in Texas media, but it does send catalogs to its Texas customers. Niagara regards the catalogs as a form of advertising. Additionally, Niagara maintains a website that functions essentially as an electronic copy of its paper catalog with a link whereby a potential customer can e-mail it to obtain a sales call, order form, or catalog. The website does not have the capability to allow customers to place online orders. Garrison has never advertised in Texas, but it did design and approve the pages of Niagara's website and catalog that advertise its products.

■■■■ For purposes of establishing personal jurisdiction, websites fall into three categories: (1) fully interactive websites clearly used for transacting business over the internet, (2) interactive websites allowing the exchange of information between a potential customer and a host computer, and (3) passive websites used only for advertising over the internet. *Reiff v. Roy,* 115 S.W.3d 700, 705–06 (Tex. App.-Dallas 2003, pet. denied). In cases involving interactive websites, the degree of interactivity determines whether there is personal jurisdiction. *Id.* at 706.

■■■■ Although Garrison contributes content to Niagara's website and catalogs, it does not control Niagara's advertising, it does not distribute the catalogs, and it does not interact with website and catalog users. Even if the trial court was correct in finding that the website is somewhat interactive, the limited interactivity is between Niagara and its customers. *See id.* (finding no continuous and systematic contacts in Texas even though Colorado hotel

franchisee participated in hotel company's website accessible to Texas customers). Thus, Niagara's website and catalog constitute the type of unilateral, third-party contacts we cannot attribute to Garrison in our jurisdictional review. *See Michiana*, 168 S.W.3d at 785. *Cf. CMMC v. Salinas*, 929 S.W.2d 435, 436 (Tex.1996) (concluding no jurisdiction over foreign manufacturer even though it provided advertising promotional materials to product distributor).

Nothing in the record shows Garrison designed its hooks with any particular market in mind other than ensuring the hook met national product standards. Watts testified Garrison has only two customers: Niagara and Miller. Although Garrison expected its products to reach Texas, Niagara alone chose the customers and geographic markets to serve, thus supporting the trial court's finding that Garrison had no control over Niagara's distribution. Niagara distributed Garrison's products in North America, South America, Europe, and Australia. Watts testified Garrison had no involvement with Niagara's Texas customers and would not necessarily know if Niagara discontinued its Texas sales. Watts testified he would not be surprised if the hook ended up in Texas—or in Chile. In his affidavit supporting Garrison's special appearance, Watts averred he did not know what percentage of Garrison's product sales occur in Texas. Thus, the record does not support Elk River's assertion that Garrison designed its hook with the Texas market in mind.

■ Likewise, the record does not show that Garrison attended the trade shows in Dallas to assess the Texas market in particular. Watts admitted he and another employee did attend trade shows two years in a row in the mid—1990's in Orlando, Florida and Dallas, Texas. Watts described the purpose behind the visits as "just for observation .... just to view the market, we had no booth or anything there. We just went down to look at product line of various competitors to see what styles, configurations were out on the market." Watts' deposition testimony, especially when viewed in context with his other testimony regarding Garrison's total deference to Niagara in marketing the products, shows Garrison attended the trade shows to scout its competitors rather than the Texas market. Furthermore, there is no evidence in the record showing Garrison exercised any control over the selection of Dallas, Texas as a site for the safety industry trade show. Sporadic attendance at trade shows in Texas, the locations of which are not within Garrison's control, does not demonstrate availment of the Texas market. *See Am. Type Culture*, 83 S.W.3d at 809.

Elk River next contends Niagara's contacts should be imputed to Garrison because Niagara availed itself of the Texas market while acting as Garrison's agent. Elk River asserts Niagara exists solely to sell Garrison products on commission.

■ The essential feature of agency is the right of control. *See Schott Glas v. Adame*, 178 S.W.3d 307, 315 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). The right of control includes the right to dictate the means and details of the agent's performance. *Id.* Agency is generally a question of fact. *Id.*

■ Garrison does not control Niagara as an agent. Although Watts agreed Niagara was Garrison's "captured distributor," he expressly denied Niagara served as Garrison's agent. Watts testified Garrison had no control over Niagara's distribution. The two companies do not share ownership or management. When questioned about the relationship between Garrison and Niagara, Watts initially affirmed that Niagara's only reason to exist is to distribute Garrison's products; however,

he immediately clarified Niagara has "other products which they sell. They're not existent dependently upon us." Scott Doan, Niagara's general manager, described Niagara in his deposition as Garrison's "commissioned salespeople," but Doan also testified Niagara sells other companies' products. Both Watts and Doan described a relationship in which Garrison delegates to Niagara all of the sales functions for Garrison's products. Elk River presented no contrary evidence showing Garrison had any right to control Niagara. We agree with the trial court that there is no evidence of an agency relationship. *See id.* at 314–17 (concluding no agency relationship where sales representative sold products of defendant manufacturer and others on commission but manufacturer did not control details of sales representative's work).

Finally, we note evidence in the record suggesting Garrison's efforts to avoid personal jurisdiction. The notion of consent underlies general jurisdiction. *Am. Type Culture*, 83 S.W.3d at 808. By availing itself of the benefits and protections of the forum's laws, a nonresident defendant consents to be sued in the forum. *Id.* When, however, a nonresident defendant purposefully structures its transactions so as to avoid the benefits and protections of a forum state's laws, it has not consented to suit within the forum. *Moki Mac*, 221 S.W.3d at 575, 2007 WL 623805, at *3; *Am. Type Culture*, 83 S.W.3d at 808; *Bearry*, 818 F.2d at 375–76.

Garrison manufactures its products in Canada and then consigns them to a Canadian distributor to perform all marketing and sales functions within the United States. Although Watts did not know if the goods were shipped F.O.B. and nothing on the packing slips or invoices so indicates, Doan testified title to the components passes from Garrison to the consign-

ee at the time the product is shipped. Evidence in the record suggesting Garrison has purposefully structured its transactions to avoid the benefits and protections of Texas law further supports the trial court's conclusion that it could not assert general jurisdiction over Garrison. *See Am. Type Culture*, 83 S.W.3d at 808.

We conclude the evidence is factually sufficient to support the trial court's findings that Garrison does not exercise control over Niagara's sales and marketing activities, does not monitor what percentage of sales occur in Texas, and does not advertise or market its products in Texas. *See Hoffmann*, 180 S.W.3d at 345. Our de novo review supports the trial court's conclusions of law regarding Garrison not attempting to service the Texas market, Niagara's agency status, and Garrison's "shadowy and thin" contacts with Texas. *See Am. Type Culture*, 83 S.W.3d at 809–810; *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex.1996) (concluding no general jurisdiction over foreign company that had no offices, employees, or bank accounts in Texas, and had never solicited business, mailed correspondence, paid taxes, and entered contracts in Texas). We overrule Elk River's first issue.

In its second issue, Elk River contends the trial court erred in concluding it lacked specific jurisdiction over Garrison. Elk River challenges the trial court's findings that Niagara sold the hook at issue to it, that foreseeability is insufficient to create jurisdiction, and that Garrison made no attempt to service the Texas market. Elk River also attacks the trial court's conclusion of law that there is no specific jurisdiction over Garrison. Elk River contends the evidence shows Garrison manufactured the hook, placed it into the stream of commerce with the expectation it would be purchased or used in Texas, sold it to Texas residents, and made "surrounding

representations regarding the ladder hook" to Texas residents. Elk River contends the sale of the hook in Texas and the representations to Texas residents show Garrison's activities were purposefully directed toward Texas, thus rendering irrelevant the issue of whether the hook ever passed through Texas. We disagree.

Elk River concedes that whether it is included within the chain of distribution is irrelevant to this jurisdictional appeal. Nevertheless, although the record does not show indisputably that Niagara sold the specific hook at issue to Elk River, invoices show Elk River bought hooks from the batch containing the hook at issue. David Lawyer, safety manager for Doty–Moore, testified during his deposition that Doty–Moore obtains its safety equipment mostly from Trinity Sling and has it "drop shipped" directly to jobsites. Lawyer further testified that Elk River is a supplier to Trinity Sling. For our purposes, we conclude the evidence is factually sufficient to support the trial court's finding that Niagara sold the hook to Elk River.

Turning to the merits of the issue, Elk River must show (1) Garrison purposefully availed itself of the Texas market and (2) the underlying litigation arises from or relates to Garrison's Texas contacts. *See Moki Mac*, 221 S.W.3d at 575–76, 2007 WL 623805, at *4. Elk River cannot meet either prong of the standard.

■ We have already discussed at length in our review of Elk River's first issue the evidence showing Garrison did not purposefully avail itself of the Texas market. Although the hook was sold eventually to a Texas corporation, Garrison did not sell it into the Texas market, did not advertise here, did not contact any customers here, and structured its business so as to avoid doing business in Texas. Thus, Garrison did not purposefully avail itself of the Texas market. *See Michiana*, 168 S.W.3d at 785–86; *see also Moki Mac*, 221

S.W.3d at 577–79, 2007 WL 623805, at *5–7 (discussing various factors that may constitute purposeful availment).

■ Moreover, even if we assume Garrison purposefully availed itself of the Texas market, the underlying litigation does not arise from or relate to its contacts with Texas. "[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585, 2007 WL 623805, at *12. The operative facts in the underlying litigation concern whether a hook was defectively designed or manufactured in Canada and whether there was negligence at a jobsite in Nebraska. Elk River points to no representations Garrison made to Texas residents. According to Watts, Garrison had no relationship with Elk River, Trinity Sling, Spectrasite, or Doty–Moore. Moreover, any representations that were made are not, by themselves sufficiently substantial to confer specific jurisdiction in this case. *See id.* at 586–87, at *13 (concluding alleged misrepresentations of safety made to Texas residents were not operative jurisdictional facts in suit for wrongful death of Texas resident occurring during rafting trip in Arizona).

The evidence before the trial court shows the hook traveled from Canada to Alabama and ended up in Nebraska. The record does not reveal whether the hook even passed through Texas on its way to Nebraska. Trinity Sling's corporate representative, identified in the record as either Bruce Hardin or Dale Fincher, testified at his deposition that Elk River sometimes drop shipped products directly to Trinity Sling's customers' job sites. Elk River was unable to determine whether the hook was delivered to Trinity Sling

in Texas or whether it was drop shipped directly to Doty–Moore.

There being no evidence Garrison purposefully availed itself of the Texas market or that Wardlow's injuries arose from or relate to any activity of Garrison within Texas or any activity conducted outside Texas and purposely directed to Texas, we conclude factually sufficient evidence supports the trial court's findings. *See Hoffmann*, 180 S.W.3d at 345. Because Garrison negated all bases of specific personal jurisdiction, we conclude the trial court did not err in concluding it had no specific jurisdiction over Garrison. *See BMC Software*, 83 S.W.3d at 793. We overrule Elk River's second issue.

Our disposition of Elk River's first two issues makes it unnecessary to address Elk River's third issue regarding whether exercising personal jurisdiction over Garrison would offend traditional notions of fair play and substantial justice. *See Hoffmann*, 180 S.W.3d at 350.

In its sole issue, Niagara contends the trial court erred in finding general jurisdiction over it because its Texas contacts are insufficient to constitute minimum contacts for jurisdictional purposes. Niagara characterizes its contacts as consisting of sales to a handful of Texas companies, mailing a few catalogs, and maintaining a passive website. Niagara suggests the trial court was swayed to find general jurisdiction by appellees' "stream of commerce" argument, which is only applicable to establishing specific jurisdiction.

Niagara posits that exercising general jurisdiction over it in Texas does not comport with traditional notions of fair play and substantial justice because its sole place of business is in Fort Erie, Ontario, Canada; it has only seven employees, all of whom work in Canada; and no Niagara employee has ever traveled to Texas on business. It concedes making a few in-person sales calls in Pennsylvania, but it denies ever making in-person sales calls in Texas. Niagara contends the evidence is legally and factually insufficient to support portions of nine of the trial court's findings of fact. Niagara also seeks review of the trial court's conclusions of law.

Wardlow responds Niagara has not met its burden to refute the trial court's findings. Wardlow contends the evidence supports both general and specific jurisdiction over Niagara. Using many of the same contentions it argued with regard to Garrison, Elk River also contends the trial court has general and specific jurisdiction over Niagara and exercising personal jurisdiction comports with traditional notions of fair play and substantial justice.

Like Garrison, Niagara has no office, employees, registered agent, or bank account in Texas. Unlike Garrison, Niagara does have active Texas customers, it has had contacts with others, and it ships additional products to Rodia, Inc., a "hands-off intermediary" in Texas that transships its products to Mexico. During the fiscal year when Munoz died, Niagara shipped $176,244.77 worth of products to eight Texas-based customers, although it does not know if the products are used in Texas or assembled and shipped out-of-state. A compilation of several years of sales figures shows Niagara received between 2.22–8.34% of its total sales from sales to Texas customers.

Niagara first challenges the portions of the trial court's finding no. 2 in which the trial court found Niagara sells Garrison's products "throughout the United States" and derives sixty-to-sixty-five percent of its sales within the United States. The sales percentage figure came from Doan's deposition testimony. Niagara contends the evidence does not support the finding because Doan characterized the sixty-to-sixty-five percent figure as a "guess."

Assuming, without deciding, that this finding regarding national sales figures is relevant in some manner to determining whether jurisdiction is proper in Texas, the finding is supported by the evidence. Although Doan denied having a customer in each of the fifty States, his personal recollection of the "big ones" included customers in Minnesota, Washington, New Jersey, North Carolina, Louisiana, Texas, California, Arizona, and Colorado. Niagara's customer list shows customers in most States, including Texas, and many other countries. Doan testified he personally had made sales calls in Alabama, Colorado, Indiana, Minnesota, North Carolina, and Pennsylvania. Doan's "guess" regarding the U.S. sales figure was corroborated by Watts, who estimated Garrison received seventy percent of its product sales in the United States.

Niagara contests the portion of the trial court's finding no. 3 that Niagara sends representatives and its catalog to the National Safety Congress Trade Show which is held at a different location in the United States each year. Niagara contends the record does not show its catalog is generally available at the trade show and it has never attended a trade show in Texas.

Doan, however, testifying about customer relationships in the year prior to Munoz's accident, admitted the catalog was available at Niagara's booth at that year's trade show and customers could have picked up catalogs "at the show." Although we agree with Niagara that the record does not show it attended any trade shows in Texas, the trial court did not find Niagara attended in Texas, and the record does support its actual finding that the trade show is held annually in different locations across the country.

Regarding the trial court's finding no. 4, Niagara contends the evidence is legally and factually insufficient to support the trial court's finding that it has eight active customers in Texas and at least some contact with sixteen Texas customers. Niagara contends the active customer count should not include Rodia. Niagara also complains the contact list includes personal friends of Doan's relatives with whom there is no business relationship.

In fact, the record shows Doan testified Niagara had eight Texas customers in mid–2003 and he included Rodia within the list. Moreover, the trial court's finding was not intended to establish Niagara was doing business in Texas solely because of its relationship with Rodia. Rather, the relationship with Rodia is one of a number of business relationships establishing Niagara's contacts with the State. Niagara's list of business contacts did include one company contacted because Doan's father was a friend of the owner. Thus, the evidence supports the trial court's finding for fifteen contacts.

In finding no. 5, the trial court made a number of findings regarding the extent of Niagara's sales in Texas between May 3, 2001 and November 30, 2005. During that period, the trial court found, Niagara sold 19,612 model GL 3100 hooks in Texas, grossed $1,357,569.34 from its Texas sales, including nearly a quarter million dollars from selling GL 3100 hooks, and there was never an interval during that period when it was not selling products in Texas. The trial court further concluded Texas sales accounted for 8.34% of Niagara's sales during the fiscal year beginning in May 2001, and that Niagara sold $297,125.81 and $176,244.77 in Texas during its 2002 and 2003 fiscal years. Niagara contends the trial court's finding should exclude sales to Rodia. Niagara also contends the trial court's sales figure for fiscal year 2002 is incorrect, even if Rodia is included, because Niagara sold only $251,606.10 in Texas that year. Although Niagara admits there were "a number of sales," it

further contends sales figures do not support the trial court's finding of continual sales throughout the 2001–2005 period.

■■■ Doan testified Niagara sold products to Rodia in Texas. Doan also prepared a sales summary chart, used as an exhibit in his deposition, showing robust sales to multiple Texas companies during all fiscal years between 2001 and 2005. Additionally, the record contains about one thousand pages of packing slips and invoices documenting Niagara's ongoing sales activity in Texas. Based on Doan's sales chart, we agree with Niagara that the evidence shows the correct sales figure for the 2002 fiscal year is only $251,606.10. The actual sales figure, however, is not material for our resolution of this jurisdictional issue. The quality of Niagara's contacts, rather than the quantity, determines whether there is personal jurisdiction. *See Am. Type Culture,* 83 S.W.3d at 809–10. Thus, we conclude the evidence is legally and factually sufficient to support the material portion of the trial court's finding.

In finding nos. 7 and 9, the trial court found Niagara sells products to distributors like Elk River rather than end users. The trial court further found Niagara was aware its products would be resold throughout the United States and it employed a distribution system to do so. The trial court found Niagara expected the Garrison hooks it sells would be used in Texas and it intended to serve both national and Texas markets. Niagara contends the evidence is legally and factually insufficient to support finding nos. 7 and 9 because the evidence shows it does not know how its customers will use the hooks or whether assemblies will be sold throughout the United States. Niagara further contends it does not employ a distribution system to resell products in Texas.

While we question the relevance to a general jurisdictional analysis of Niagara's knowledge of what ultimately happens to the products after they leave its customers' possession, we further note that its contentions are at odds with Doan's testimony. Doan testified he believed a majority of the Garrison hooks Niagara sold to Texas-based distributors would end up with end users in Texas. Doan admitted the hooks Niagara sells could end up anywhere, including Texas. If we accept Niagara's own interpretation of its relationship with Rodia, then Rodia is Niagara's Texas-based distributor for transshipping products into the Mexican market. Furthermore, the evidence in the record shows Elk River distributes the products Niagara sells it, including distributing products to Texas customers, such as Trinity Sling.

In finding no. 8, the trial court found Niagara advertises and markets products in Texas by sending catalogs to Texas customers. The trial court further found Niagara contacts Texas customers to clarify and track purchase orders, to track sales, and to report the status of orders to customers. Niagara points out it sent only eight 2006 catalogs to Texas and it contends there is no evidence it sent catalogs to Texas "during the relevant time period prior to the accident. . . ."

Doan testified he considered Niagara's catalogs to be a form of advertising. Although Doan did testify Niagara does not issue catalogs every year, he also testified, regarding companies that bought Niagara products during the period between May 2002 and April 2003, "the majority of [companies ordering product] would get [a catalog], but I can't definitively say that everyone got one." In his affidavit, Doan averred customers get a new catalog every two or three years. Thus, it appears Niagara intended the catalogs as a continuing form of advertising until such time as another catalog was sent. Even if no catalogs were mailed during the year in ques-

tion, the trial court could reasonably infer the existing catalogs were used to order product. The record shows eight Texas-based companies (including Rodia) bought Niagara products during the fiscal year from May 2002 and April 2003.

Niagara does not challenge finding nos. 11 and 12 so much as interpret and clarify them. In finding no. 11, the trial court found in part that Niagara's website allowed customers to contact Niagara by email. If Niagara received an email from a potential customer in Texas, it would then call the customer. Niagara points out its website is not particularly interactive and there is no evidence any Texas-based customer ever used the website.

The trial court did not find that any Texas customers contacted Niagara through its website. Doan did testify, however, that if a customer, including presumably a customer in Texas, did email Niagara, that customer would receive a follow-up sales call. Thus, the evidence does support the trial court's actual finding.

■■■ In finding no. 12, the trial court found Munoz maintained a post office address in Texas. The trial court's finding is supported by Munoz's W–2 tax form which shows a Texas postal box address. Niagara contends, citing documents attached as exhibits to its brief, that while Munoz may have maintained a Texas post office box address, he was a resident of Louisiana. The attachments to Niagara's brief are not evidence before the court. *See Perry v. Kroger Stores, Store No. 119,* 741 S.W.2d 533, 534 (Tex.Civ.App.-Dallas 1987, no writ). Nevertheless, the trial court did not find Munoz was a resident of Texas. The trial court's finding recites only that Munoz maintained the postal box address. Thus, Niagara's contention is not adverse to the trial court's finding.

Having reviewed the record evidence and Niagara's contentions regarding legal and factual sufficiency, with the immaterial exceptions of reducing the number of Texas contacts to fifteen and slightly reducing the fiscal year 2002 sales figure to $251,606.10, we conclude more than a mere scintilla of evidence supports each challenged finding of fact, and the findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See BMC Software,* 83 S.W.3d at 794; *Hoffmann,* 180 S.W.3d at 345.

Having concluded the evidence supports the trial court's findings, we now review de novo the trial court's conclusions of law. The trial court concluded Niagara was subject to general jurisdiction in Texas because it was doing business in Texas and it had purposefully established minimum contacts with Texas. The trial court concluded Niagara's contacts with Texas are continuous and systematic because it does business in Texas, and it continuously and systematically sells and markets products in Texas, advertises in Texas, communicates with customers and solicits business in Texas and, thus, has purposefully availed itself of the Texas market. The trial court concluded Niagara's website was "sufficiently interactive" to be considered a point of contact with Texas. The trial court concluded the exercise of jurisdiction over Niagara comports with traditional notions of fair play and substantial justice because of the contacts previously mentioned. The trial court concluded the burden on Niagara would be minimal because it attended national conferences and it sent employees on nationwide in-person sales calls. Finally, the trial court concluded Texas had an interest in protecting citizens from defective products and providing a forum for compensation, regulating the quality of products in its stream of commerce, and in adjudicating this particular dispute.

Although the parties dispute how interactive Niagara's website is and when it was implemented, the evidence shows customers may view Niagara's catalog on the website and contact the company for more information and to place orders. Thus, it appears the website is passive advertising rather than a purposeful activity directed toward Texas residents. *See Exito Electronics, Co., Ltd. v. Trejo,* 166 S.W.3d 839, 858 (Tex.App.-Corpus Christi 2005, no pet.) (concluding website catalog with contact information for issuer was passive website for jurisdictional purposes); *Gessmann v. Stephens,* 51 S.W.3d 329, 339 (Tex.App.-Tyler 2001, no pet.) (concluding website posting company's name, logo, and email link, while "interactive," is too passive to serve as basis for personal jurisdiction).

■ Nevertheless, assuming, without deciding, that Niagara's website is not "sufficiently interactive" as the trial court concluded, an incorrect conclusion of law does not require reversal if the controlling findings of fact support the trial court's order under a correct legal theory. *Barnett v. County of Dallas,* 175 S.W.3d 919, 923 (Tex.App.-Dallas 2005, no pet.); *City of Houston v. Cotton,* 171 S.W.3d 541, 546 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). In this case, the conclusion regarding the website is immaterial to resolving Niagara's special appearance.

The trial court did not view the website as determinative of jurisdiction, rather it concluded the website was sufficiently interactive to be "considered as part of [Niagara's] contacts with Texas." It is Niagara's other contacts with the State of Texas that are dispositive of the appeal.

■ The parties dispute the relevant time period for analyzing Niagara's contacts with Niagara arguing for the 2002–03 period from sale of the hook to Munoz's death and appellees contending contacts are relevant up to the date suit was filed.

Resolution of this conflict would be material only if Niagara had continuous and systematic contacts during one time interval and not during the other. In fact, the timing dispute is immaterial because Niagara had continuous and systematic contacts throughout the period from 2001–05. Niagara's own sales records show robust sales to Texas companies for the past five years, including the years when the hook was manufactured and when Munoz died. Moreover, Garrison and Niagara have deliberately structured their relationship in such a manner that Niagara does business in states like Texas while Garrison does not. *See Am. Type Culture,* 83 S.W.3d at 808. The deposition testimony, sales chart, and packing slips show Niagara availed itself of the Texas market by systematically and continuously shipping products to and interacting with Texas customers, thus establishing a pattern of continuing and systematic activity. *See id.* at 809. We conclude the trial court did not err in concluding Niagara has sufficient minimum contacts to justify the exercise of general jurisdiction in Texas. *Cf. Design Info. Sys. v. Feith Sys. & Software, Inc.,* 801 S.W.2d 569, 571 (Tex.App.-Fort Worth 1990), *aff'd in part, rev'd in part* 813 S.W.2d 481 (Tex.1991) (per curiam op.) (repeated sales transactions with Texas residents justified conclusion nonresident software company's contacts with Texas were continuing and systematic).

■ Likewise, we agree the trial court may exercise general jurisdiction over Niagara without violating traditional notions of fair play and substantial justice. Even though Niagara is a small company, it conducts a far-flung global business. We agree with the trial court that Niagara's numerous sales calls and trade show attendance throughout the United States shows the burden on Niagara to defend itself in Texas is minimal. The State of

Texas does have at least some small interest in adjudicating this dispute because several of the defendants are Texas corporations and the decedent maintained at least an address within the State. Moreover, because so many of the defendants do business in Texas, resolving the dispute here would be most efficient for the plaintiff. Neither side has presented any evidence regarding how the litigation would affect Canada's procedural and substantive policies. We therefore conclude that a careful inquiry into the reasonableness of the trial court's assertion of general jurisdiction over Niagara, mindful of our unwillingness to impose the burden of international litigation upon foreign defendants, supports the trial court's determination to exercise personal jurisdiction. *See Guardian Royal,* 815 S.W.2d at 228–32.

Because the trial court may exercise general jurisdiction over Niagara, appellees' arguments in favor of exercising specific jurisdiction are moot. Moreover, for the reasons we have already stated in connection with Elk River's appeal, we conclude Wardlow's cause of action did not arise in Texas or relate to Niagara's activities in Texas and, therefore, specific jurisdiction does not exist. *See Moki Mac,* 221 S.W.3d at 575, 2007 WL 623805, at *4; *BMC Software,* 83 S.W.3d at 796. Thus, the trial court did not err in failing to make a positive finding on the exercise of specific jurisdiction. We overrule Niagara's sole issue.

We affirm the trial court's order.