# Supreme Court of Texas

―――

No. 21-0130

―――

The State of Texas,

*Petitioner*,

v.

Volkswagen Aktiengesellschaft,

*Respondent*

―――

On Petition for Review from the
Court of Appeals for the Third District of Texas

―――

*~ consolidated for oral argument with ~*

―――

No. 21-0133

―――

The State of Texas,

*Petitioner*,

v.

Audi Aktiengesellschaft,

*Respondent*

―――

On Petition for Review from the
Court of Appeals for the Third District of Texas

―――

JUSTICE HUDDLE, joined by Chief Justice Hecht and Justice Bland, dissenting.

This Court has long held that a nonresident manufacturer's placement of goods into the stream of commerce with awareness those goods will eventually enter Texas is, alone, insufficient to justify the exercise of personal jurisdiction over it. We have instead held—consistent with U.S. Supreme Court precedent—that federal due-process protections require additional conduct evidencing the defendant's purposeful targeting of the Texas market. This "plus factor" requirement may be satisfied by a foreign defendant's design of a Texas-specific product, advertisements in Texas, solicitation of business in Texas, or by its exercise of control over the means and details of the distribution system that brought goods into Texas. But while our precedents allow for variation in the form the plus factor may take, we have been steadfast in requiring that one exist and in holding that, in its absence, jurisdiction does not.

Today the Court departs from these precedents by permitting the exercise of jurisdiction over two German manufacturers[1] without any evidence of their (as opposed to their affiliated U.S. distributor's) Texas-specific contacts satisfying the plus-factor requirement. My disagreement with the Court boils down to two points. First, while the Court recognizes that the record does not support imputing VW America's (the U.S. distributor's) Texas contacts to the German

---

[1] We refer to these corporations, Volkswagen Aktiengesellschaft (VW Germany) and its subsidiary Audi Aktiengesellschaft (Audi Germany), collectively as the "German manufacturers."

manufacturers under either an alter-ego or veil-piercing theory, it relies on an agency theory to accomplish the same result. The Court acknowledges, as it must, that the German manufacturers lack any physical presence in Texas and that there is no evidence of any Texas contacts *by the German manufacturers themselves* that justify exercising jurisdiction over them. So it resorts instead to an agency theory, arguing that the contacts of VW America and local VW and Audi dealerships should be deemed contacts of the German manufacturers because the Importer Agreements gave the German manufacturers a right to initiate recalls and VW America a corresponding contractual obligation to perform them. But these contractual rights and obligations do not justify the exercise of jurisdiction here. An agency relationship requires more than a right to instruct another to perform a task—the principal must also control the means and details of the process by which the agent accomplishes the task. Here, there is no evidence that the German manufacturers exerted the requisite level of control over the means and details of the recall process to create an agency relationship that would justify haling them into Texas courts.

The second point of disagreement with the Court relates to what constitutes targeting of Texas. The Court holds that in directing VW America to conduct a nationwide recall, the German manufacturers targeted Texas. Yet the U.S. Supreme Court's plurality opinion in *Nicastro*—which this Court has twice endorsed—makes clear that a defendant's intent to serve the U.S. market as a whole does not necessarily amount to targeting each of the fifty states. Rather, we have required Texas-specific availment, which is absent here.

3

Under today's holding, any foreign manufacturer directing its U.S. distributor to conduct a nationwide recall will be subject to personal jurisdiction in Texas courts, regardless of whether it targeted Texas. Such a rule eviscerates the plus-factor requirement and dilutes our personal-jurisdiction framework to the very stream-of-commerce theory our precedents reject. While I sympathize with the State's and the Court's desire to hold the German manufacturers to account—in Texas courts—for their admitted misconduct, the assertion of personal jurisdiction over them in this case constitutes a departure from our precedents that I cannot endorse. I respectfully dissent.

## I.     Personal Jurisdiction Framework

Texas courts may exercise personal jurisdiction over a nonresident defendant when (1) our long-arm statute authorizes it and (2) doing so comports with federal and state constitutional due-process guarantees. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). But because Texas's long-arm statute extends jurisdiction as far as the federal constitutional requirements will allow, it is really the "federal due process requirements [that] shape the contours of Texas courts' jurisdictional reach." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). Accordingly, we rely on federal precedents, in addition to our own, in assessing whether a court has personal jurisdiction over a defendant. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

The assertion of personal jurisdiction over a nonresident defendant is constitutional when two criteria are met: (1) the defendant has established "minimum contacts" with the forum state, and (2) the

4

exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *TV Azteca, S.A.B. de C.V. v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Here, the German manufacturers conceded at oral argument that their jurisdictional challenge relates only to the minimum-contacts portion of the personal-jurisdiction test. We thus focus our analysis on whether the requisite contacts have been established.

A defendant's contacts with a forum state may give rise to either general or specific jurisdiction. *Old Republic*, 549 S.W.3d at 559. The general-jurisdiction test is a "high bar," *Searcy*, 496 S.W.3d at 72, as the defendant's affiliations with the forum state must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State."[2] *TV Azteca*, 490 S.W.3d at 37 (alteration in original) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). Specific jurisdiction, on the other hand, extends to "defendants less intimately connected with a State" and encompasses a "narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). The question in this case is whether Texas can exercise specific personal jurisdiction over the German manufacturers.

A court may exercise specific jurisdiction when (1) the defendant purposefully avails itself of the privilege of conducting activities in the forum state and (2) the suit arises out of or relates to those contacts with the forum. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8–9

---

[2] The State does not contend that the German manufacturers are subject to general jurisdiction in Texas.

(Tex. 2021). The German manufacturers concede that the relatedness prong is not in dispute here, leaving only a question on purposeful availment, which we have called "[t]he 'touchstone' of a minimum-contacts analysis." *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 (Tex. 2016) (quoting *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005)).

The purposeful-availment analysis is guided by three main principles, which bear repeating. *See Michiana*, 168 S.W.3d at 785. First, only the defendant's contacts with the forum are relevant—the unilateral activity of a third party is not. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). Second, the defendant's contacts must actually be "purposeful" as opposed to "random, fortuitous, or attenuated." *Id.* And lastly, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Michiana*, 168 S.W.3d at 785.

## II.    Analysis

**A.    The State does not assert a theory that supports imputing VW America's or the local dealers' contacts to the German manufacturers.**

As the German manufacturers point out in their briefing, "VW America has *not* challenged the trial court's personal jurisdiction over it." Nor could VW America credibly contest personal jurisdiction given the nature and quality of its Texas-specific contacts. VW America has "complete and exclusive decision-making authority" over which of the cars it purchased from the German manufacturers "w[ould] be exported to Texas, marketed in Texas, or sold to Texas dealerships." By selling thousands of these cars directly to the local franchise dealers in Texas,

6

as well as distributing the recall software installed by the local dealers, VW America undoubtedly has purposefully availed itself of the Texas market. But neither VW America's purposeful availment of Texas nor the Texas presence of VW and Audi dealers supports the Court's conclusion that the *German manufacturers* are subject to jurisdiction in Texas.

The Court acknowledges, as it must, the longstanding principle that "parent and subsidiary corporations are presumed to be separate from one another." *Ante* at 30; *see BMC Software*, 83 S.W.3d at 798 (quoting *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 339 (Tex. 1968)); *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 376 (Tex. 1984). Accordingly, Texas courts generally do not impute the contacts of a subsidiary doing business in the state to its parent. *See Cornerstone*, 493 S.W.3d at 72 ("[S]o long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." (quoting *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 172 (Tex. 2007))). Instead, we analyze each defendant's contacts with the forum separately. *See Luciano*, 625 S.W.3d at 9 ("When assessing minimum contacts, we look only to the defendant's contacts with the forum . . . .").

Texas courts have, however, recognized two circumstances in which a court assessing whether personal jurisdiction exists may impute one entity's contacts to another. First, a court may impute the contacts of a corporation doing business in Texas to another corporation if it is the alter ego of the other. *See BMC Software*, 83 S.W.3d at 798 (explaining that the alter-ego theory permits a court to exercise personal

7

jurisdiction over a foreign corporation "if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's 'doing business' to the subsidiary" (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983))). Second, a court may impute the contacts of an agent to its principal if the requisite agency relationship is established. *See Stocksy United v. Morris*, 592 S.W.3d 538, 547 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Under Texas law, an agency-based theory of imputed contacts may serve as the basis for the exercise of personal jurisdiction over a foreign defendant."); *Coleman v. Klöckner & Co. AG*, 180 S.W.3d 577, 588 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("An agent's contacts can be imputed to the principal for purposes of the jurisdictional inquiry."). These distinct but similar concepts have been referred to together as the "imputed-contacts theories." *Cap. Fin. & Com. AG v. Sinopec Overseas Oil & Gas, Ltd.*, 260 S.W.3d 67, 85 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *see also Greenfield Energy, Inc. v. Duprey*, 252 S.W.3d 721, 736 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("We conclude that the contacts of the Primera entities may not be imputed to CL Financial or Duprey under an alter ego or agency theory.").[3]

---

[3] Federal courts have articulated the exceptions in a similar way. *See, e.g.*, *Maurice Pierce & Assocs., Inc. v. Computerage, Inc.*, 608 F. Supp. 173, 176 (N.D. Tex. 1985) ("Two theories have been employed by the courts in determining whether the business activities of one corporate entity may be imputed to a related corporate entity for purposes of personal jurisdiction. These theories are (1) the 'agency' theory and (2) the 'control' or the 'alter-ego' theory." (citations omitted)).

We have been careful, however, to require that a party seeking to establish that an entity is an alter ego or an agent of another adduce robust supporting evidence, lest these exceptions swallow the general rule that forbids imputing one entity's contacts to the other. *See, e.g.*, *Cap. Fin. & Com.*, 260 S.W.3d at 83 ("[T]he trial court would have to indulge a prohibited presumption—that an agency relationship exists— in order to exercise personal jurisdiction based on Capital Finance's allegations . . . ."); *Greenfield Energy*, 252 S.W.3d at 733–34 (concluding no agency relationship existed to support the imputation of contacts because there was no evidence of control, actual or apparent authority, or ratification); *Coleman*, 180 S.W.3d at 588 ("[A]gency will not be presumed, and the party asserting the relationship has the burden of proving it."); *Schultz v. Rural/Metro Corp. of N.M.–Tex.*, 956 S.W.2d 757, 761 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (holding that conclusory statements contained in affidavits are "incompetent" to establish an agency relationship).

1. **All agree that neither VW America's Texas contacts nor the local dealers' Texas presence can be imputed to the German manufacturers under an alter-ego theory.**

The alter-ego exception permits a court to impute a subsidiary's contacts to its parent when "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *BMC Software*, 83 S.W.3d at 798 (quoting *Hargrave*, 710 F.2d at 1159). Alter-ego status has monumental legal consequences and, accordingly, is not casually

9

proven. All agree that this exception does not apply here. Indeed, the State has expressly disclaimed any reliance on a jurisdictional veil-piercing (i.e., alter-ego) theory as a basis to impute the contacts of VW America or the local dealerships to the German manufacturers. The Court thus correctly acknowledges, as it must, that it cannot "disregard corporate separateness or fuse the intermediaries with the German manufacturers based on alter ego or any other veil-piercing theory." *Ante* at 31. In doing so, it necessarily acknowledges that the record lacks evidence that the German manufacturers controlled VW America generally. On this much, we agree. Yet despite conceding there is not even arguable evidence of that degree of control, the Court nevertheless concludes there is evidence that the German manufacturers controlled the details and means of VW America's recall campaign to a degree sufficient to render VW America a mere agent or passthrough bereft of influence, so that the subsidiary's contacts can nevertheless be attributed to the German manufacturers. I disagree for the reasons discussed below.

2. **No record evidence supports imputing VW America's or the local dealers' Texas contacts to the German manufacturers under an agency theory.**

The Court maintains that the question in this case is "whether *the manufacturers' contacts* with Texas . . . satisfy constitutional requisites to exercising specific personal jurisdiction." *Id.* at 3 (emphasis added). While the Court takes pains to say it does not impute contacts to justify the exercise of jurisdiction, *see id.* at 56 n.144, it relies on agency principles to do exactly that. The Court concludes "the German manufacturers used the dealerships as their 'boots on the ground' for

10

after-sale recall- and service-campaign purposes." *Id.* at 29. Our courts—as well as a long line of federal cases[4]—make clear that agency is a "theory of imputed contacts" in the personal-jurisdiction context. *Cap. Fin. & Com.*, 260 S.W.3d at 85. The Court's agency analysis thus by its very nature imputes the contacts of others to the German manufacturers in holding that Texas can maintain jurisdiction over them. That is the agency exception's raison d'être.

Imputing VW America's or the local dealers' contacts to the German manufacturers under an agency theory requires consideration of Texas's substantive agency law.[5] Our law makes clear that the key inquiry to determine whether an agency relationship has been established concerns the contours of the right to control and the degree to which it is exercised. *Greenfield Energy*, 252 S.W.3d at 733 ("[W]hether one describes the theory for imputing one corporation's contacts to another as a theory of agency or alter ego, the critical test remains that of the right or exercise of control."). Under Texas law, "[f]or

---

[4] *See, e.g.*, *Trs. of Purdue Univ. v. STMicroelectronics N.V.*, No. 6:21-cv-727-ADA, 2022 WL 1242475, at *5 (W.D. Tex. Apr. 27, 2022) ("Minimum contacts can also be imputed from one entity to another if an agency relationship exists between them."); *Wapp Tech Ltd. P'ship v. Micro Focus Int'l, PLC*, 406 F. Supp. 3d 585, 594–95 (E.D. Tex. 2019) ("For purposes of specific personal jurisdiction, the contacts of a third-party may be imputed to the defendant under either an agency or alter ego theory." (quoting *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1379 (Fed. Cir. 2015))); *Garcia v. Peterson*, 319 F. Supp. 3d 863, 887 (S.D. Tex. 2018) ("Under Texas law, an agent's contacts can be imputed to its principal for personal jurisdiction purposes.").

[5] *See In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 810 F. Supp. 2d 1100, 1107 (S.D. Cal. 2011) ("[W]hen determining whether contacts of a subsidiary may be imputed to the parent for purposes of personal jurisdiction, [federal] courts look to the choice-of-law rules of the forum state to decide which state's substantive law on alter ego or agency applies.").

an agency relationship to allow for imputation of contacts, the evidence must establish that the principal has both the right: (1) to assign the agent's task; and (2) to control the means and details of the process by which the agent will accomplish that task." *In re Toyota Hybrid Brake Litig.*, No. 4:20-CV-127, 2021 WL 2805455, at *5 (E.D. Tex. July 6, 2021) (internal quotations omitted); *see also Dipprey v. Double Diamond, Inc.*, 637 S.W.3d 784, 804 (Tex. App.—Eastland 2021, no pet.) (explaining that a principal must control "not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task"). Courts will not presume the existence of an agency relationship; rather, a party alleging the existence of such a relationship bears the burden of proving it. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017).

The Court ultimately concludes that the German manufacturers exercised the necessary degree of control over the means and details by which VW America and the local dealerships executed the recall to give rise to an agency relationship. To arrive at that conclusion, the Court relies heavily on the terms of the contracts between VW America and the German manufacturers. In the Court's view, those two 1995 Importer Agreements "grant the German manufacturers control over both VW America and its network of dealerships, including those in Texas, for purposes of carrying out recall and service campaigns." *Ante* at 28. It says that these agreements required VW America to carry out the recall campaign "and directly compel local . . . dealerships" to do the same. *Id.* at 28–29. Seeking to downplay VW America's role in directing and executing the recall, the Court quotes the distributor's corporate

12

representative's reference to VW America as a mere "passthrough" entity to which VW Germany provided information about recall and service campaigns. *Id.* at 29.

I cannot agree that the record evidence supports a finding that the German manufacturers controlled the means and details of VW America's and the local dealers' execution of the recall so as to give rise to an agency relationship. To begin, the "General Principles" section of the Importer Agreements explicitly disclaims such a relationship. The VW Germany Importer Agreement states:

> [VW America] shall carry on all business pursuant to this Agreement as an independent entrepreneur on its own behalf and for its own account. [VW America] is *not an agent* or representative of [VW Germany] and shall not act or purport to act for the account of or on behalf of [VW Germany].

(Emphasis added.) While explicit disclaimers of an agency relationship are not dispositive, Texas courts consider such language strong evidence that the parties intended to preserve an independent status.[6] *See Stocksy*, 592 S.W.3d at 548 (rejecting agency-based theory of imputed contacts where the agreement "expressly provide[d] that Curette work[ed] as an independent contractor" and there was no evidence to the

---

[6] Federal courts applying Texas law have relied on similar contractual provisions in concluding an agency relationship did not exist. *See, e.g.*, *RealPage Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 521 F. Supp. 3d 645, 685 (N.D. Tex. 2021) (noting a written agreement expressly providing for an independent-contractor relationship is "determinative of the parties' relationship" absent evidence that (1) the agreement was a sham, (2) the hiring party exercised control in a manner inconsistent with the contract's provisions, or (3) the parties amended the contract (quoting *Northwinds Abatement, Inc. v. Emps. Ins. of Wausau*, 258 F.3d 345, 351 (5th Cir. 2001))).

13

contrary); *Trokamed GmbH v. Vieira*, No. 01-17-00485-CV, 2018 WL 2436610, at *8 (Tex. App.—Houston [1st Dist.] May 31, 2018, no pet.) (declining to impute contacts under an agency theory where a "distribution agreement reflect[ed] the parties' express agreement that Blue Endo would preserve its independent status"). Giving credence to the parties' own characterization of their relationship honors our commitment to enforcing the terms of a contract as written. *See Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 290 (Tex. 2021) (Boyd, J., concurring) (stating "[o]ur long-standing and oft-repeated commitment to upholding the freedom of contract demands respect for the parties' express agreement" absent "conclusive, 'persistent' evidence of actual control" (quoting *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 592 (Tex. 1964))). And the Court's conclusion that an agency relationship exists between the German manufacturers and the local dealerships stands on even weaker footing given that the dealerships were not parties to the Importer Agreements. *See Pioneer Hi-Bred Int'l, Inc. v. Talley*, 493 S.W.2d 602, 605–06 (Tex. App.—Amarillo 1973, no writ) (concluding an agency relationship did not exist between two parties where they "had no contractual relationship"). The Court discards this contractual provision entirely.

Even if we were to look behind the explicit disclaimer of an agency relationship, the terms of the Importer Agreement themselves do not support a conclusion that the German manufacturers controlled "the means and details" by which VW America or the local dealerships conducted business. *See In re Toyota Hybrid*, 2021 WL 2805455, at *5. The agreements did not grant the German manufacturers day-to-day

14

control over VW America's or the local dealers' operations.[7] *See Greenfield Energy*, 252 S.W.3d at 731–32, 734 (rejecting agency-based theory of imputed contacts where the parent corporation did not control "day-to-day operations" of its subsidiary). For instance, the Importer Agreements required VW America to "exhaust fully all market opportunities" in the U.S., leaving *VW America* with the discretion to sell as many or as few cars in Texas as it wanted.[8] In other words, whether or how to target Texas was a decision the German manufacturers did not make themselves; it was a decision they left *for VW America.* A distribution system in which the distributor retains control over such marketing decisions—common in the car industry and others—falls far short of the mark. It does not reflect the requisite degree of control by the German manufacturers that is necessary to deem VW America a mere agent and thus exercise jurisdiction over the

---

[7] In fact, Texas law actually *prohibits* car manufacturers like the German manufacturers from controlling dealerships. *See* TEX. OCC. CODE § 2301.476(c)(2) (prohibiting manufacturers from "directly or indirectly . . . operat[ing] or control[ling]" car dealerships in Texas); *id.* § 2301.003(b) (stating contractual provisions inconsistent with Chapter 2301 are "unenforceable").

[8] Many Texas courts have relied on the lack of control over a distribution system in concluding the relationship between a manufacturer and a distributor is *not* an agency relationship. *See, e.g.*, *Skylift, Inc. v. Nash*, No. 09-19-00389-CV, 2020 WL 1879655, at *7 (Tex. App.—Beaumont Apr. 16, 2020, no pet.) (holding no agency relationship existed between a manufacturer and a distributor where "[t]here was no evidence that [the manufacturer] controlled . . . where the distributors sold the products"); *Elk River, Inc. v. Garrison Tool & Die, Ltd.*, 222 S.W.3d 772, 782 (Tex. App.—Dallas 2007, pet. denied) (declining to impute contacts under an agency theory where the manufacturer "had no control over [the distributor's] distribution"); *Happy Indus. Corp. v. Am. Specialties, Inc.*, 983 S.W.2d 844, 852–53 (Tex. App.—Corpus Christi–Edinburg 1998, pet. dism'd w.o.j.) (concluding same). The Court does not engage with these authorities.

German manufacturers.[9] *See Anchia v. DaimlerChrysler AG*, 230 S.W.3d 493, 501 (Tex. App.—Dallas 2007, pet. denied) (holding Texas could not exercise personal jurisdiction over a German car manufacturer where the manufacturer did not exercise "control with respect to sales of Mercedes-Benz vehicles . . . in the United States" or "control over any Mercedes-Benz retail dealer in Texas").

The contractual provisions in the Importer Agreements relating to post-sale recall and service campaigns do not change my conclusion. The Court's two purported smoking guns are generic provisions that require VW America to (1) perform warranty repairs "in accordance with [the German manufacturers'] instructions, guidelines and/or procedures" and (2) "cause [the local dealerships] to perform campaign inspections." But contractual provisions requiring VW America to follow general guidelines and procedures in carrying out the recall campaign can hardly be said to grant the German manufacturers control over the means and details of that campaign. *See Smith v. Foodmaker, Inc.*, 928 S.W.2d 683, 687 (Tex. App.—Fort Worth 1996, no writ) (declining to find an agency relationship between a franchisor and franchisee where the franchisee "was required to follow certain corporate standards" but otherwise retained control over day-to-day operations). To be sure, these

---

[9] The Court faults my analysis for "focus[ing] on initial vehicle sales and related provisions of the Importer Agreements while neglecting the after-sale recall and service campaigns and the contract provisions governing them." *Ante* at 47. While the contract provisions relating to post-sale activity, which I discuss next, are certainly relevant to the control inquiry, we cannot divorce them from the provisions governing initial vehicle sales. After all, the only reason a recall would affect vehicles in Texas is because *VW America* initially— and independently—decided to sell cars here.

provisions enable the German manufacturers to initiate a recall or service campaign (which may be required under federal law). But merely having the right to assign a task and providing general instructions about how to carry it out does not indicate the existence of control required to create an agency relationship. *See Ross v. Tex. One P'ship*, 796 S.W.2d 206, 212 (Tex. App.—Dallas 1990) (rejecting agency relationship and noting "[t]he fact that additional information would have to be conveyed . . . before the tasks could be carried out does not imply that [the purported principal] would exercise control over the details of the assigned jobs"), *writ denied per curiam*, 806 S.W.2d 222 (Tex. 1991).

Ultimately, the Court's analysis ignores an obvious business reality: a parent corporation will *always* "control, direct, and supervise the subsidiaries to some extent." *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) (Posner, C.J.). Just as we have held that "[a]ppropriate parental involvement" through the "articulation of general policies," standing alone, does not establish the degree of control necessary to fuse two corporations together under an alter-ego theory, *see PHC–Minden*, 235 S.W.3d at 176 (quoting 16 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 108.42[3][b] (3d ed. 2007)), the German manufacturers' articulation of "certain corporate standards" in carrying out the recall campaign is, in itself, insufficient to establish the degree of control needed for an agency relationship.[10] *See Smith*, 928 S.W.2d at 687.

---

[10] Under the Court's formulation, an agency relationship may exist any time a manufacturer sets general parameters to protect the integrity of its

The record bears out the fact that the German manufacturers did not control the means and details by which VW America executed the recall campaign. To be sure, the German manufacturers uploaded the recall software to a server in Germany. Yet, as the court of appeals correctly noted, VW America retained responsibility for distributing the software updates to local dealers across the United States, including Texas. *See* ___ S.W.3d ___, 2020 WL 7640037, at \*5 (Tex. App.—Austin 2020). And the means and details by which VW America distributed the software update to Texas resulted from its *own* decision to target the Texas market for car sales in the first instance, not from any decision the German manufacturers made. The German manufacturers' mere knowledge that the software would end up in Texas because of VW America's prior, independent decision to establish a dealer network and sell cars here is not itself sufficient to hale them into Texas courts. *See TV Azteca*, 490 S.W.3d at 46 ("A product seller's 'awareness that the stream of commerce may *or will* sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.'" (emphasis added) (quoting *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996))); *see also Zinc Nacional, S.A. v. Bouché Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010) ("The fact that a seller knows his goods will end up in the forum

brand. *Cf. Theos & Sons, Inc. v. Mack Trucks, Inc.*, 729 N.E.2d 1113, 1120 (Mass. 2000) (concluding requirement that a dealer perform work "in accordance with [the manufacturer's] policies and standards" did not create an agency relationship but was "merely reflective of the ordinary desire of manufacturers to set sufficient minimum performance and quality standards to protect the good name of their trademark").

18

state does not support jurisdiction when the seller made no attempt to market its goods there."). What ultimately matters is that once the German manufacturers developed the software and uploaded it in Germany, their work was at an end because VW America retained the discretion to determine the details about where and how to carry out the recall. The fact that the German manufacturers provided VW America a list of VINs that reflected some of the cars were in Texas reflects no more than their mere knowledge that the recall would, in part, be carried out here. It does not amount to targeting Texas. Nor does it demonstrate their control over the means and details of how VW America and the local dealers would go about executing the recall.

With respect to communicating about the recall, it was also VW America—not the German manufacturers—that exercised control over the means and details. VW Germany's corporate representative testified that it was VW America's "responsibility to draft customer letters," and VW Germany stated in interrogatory answers that the German manufacturers "played no role . . . in communications with dealers regarding the implementation of the software updates." While the German manufacturers sent VW America a technical description for use in the recall campaign, VW America itself used it to draft step-by-step instructions for the dealers, which the German manufacturers merely reviewed and approved for accuracy. This involvement by the German manufacturers is precisely the type of quality control one would expect from a manufacturer with institutional knowledge concerning the technical aspects of its product. It simply does not amount to exercising control over the means and details of the recall campaign. *See*

19

*Nears v. Holiday Hosp. Franchising, Inc.*, 295 S.W.3d 787, 796 (Tex. App.—Texarkana 2009, no pet.) ("Quality control standards . . . should not be construed to create an agency relationship.").

If the strong weight of authorities that counsel against recognizing an agency relationship were not enough, one would expect that the Court would heed the State's own admissions to the same effect. Just a few months ago, the State asserted in its summary-judgment briefing that it was not the German manufacturers but, rather, *VW America* that not only "arranged, managed, promoted, [and] advertised" but also "directed" the recalls at Texas dealerships. State's Motion for Partial Summary Judgment at 10, *Texas v. Volkswagen Grp. of Am., Inc.*, No. D-1-GN-15-004513 (200th Dist. Ct., Travis County, Tex. Dec. 12, 2022). In other words, when trying to establish personal jurisdiction over the German manufacturers, the State characterizes VW America as a mere passthrough under the German manufacturers' proverbial thumbs. But when it comes to demonstrating VW America's liability, the State contends VW America itself—not the German manufacturers—called the shots. The State cannot have it both ways.

In the absence of evidence to support an alter-ego or agency finding, the question of whether we can assert personal jurisdiction over the German manufacturers requires consideration of only *their* contacts with Texas, not those of VW America or the local dealers. To hold otherwise—and displace corporate formalities so hastily—would prevent nonresident defendants from "structur[ing] their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp.*

*v. Woodson*, 444 U.S. 286, 297 (1980). Guarding against this is particularly important here given the German manufacturers' status as foreign defendants. *See BMC Software*, 83 S.W.3d at 795 (noting "the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system" makes the minimum-contacts analysis "particularly important" for an international defendant); *see also Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 115 (1987) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting))).

**B.** **The German manufacturers have not purposefully targeted the Texas market through their own conduct.**

As discussed above, neither of the imputed-contacts theories applies here, so only the German manufacturers' contacts are relevant to determining whether Texas courts can exercise personal jurisdiction over them. The Court concludes that the German manufacturers established contacts with Texas through their own conduct by "directing" VW America "to carry out the recall and service campaigns" throughout the United States. *Ante* at 23–24. It concludes the German manufacturers' contacts are themselves sufficient to give rise to jurisdiction, but that conclusion rests on a misreading of our Court's recent personal-jurisdiction cases. *Spir Star* and *Luciano*, on which the Court relies most heavily, require evidence of purposeful targeting specific to the *Texas* market, which is absent here.

The Court notes that *Spir Star* involved an agreement between a manufacturer and an independent distributor that agreed to serve as the manufacturer's sales agent in Texas. *Id.* at 27. We held in that case

21

that the German manufacturer was subject to personal jurisdiction in Texas because it "specifically target[ed] Texas as a market for its products," even though the manufacturer's "sales [were] conducted through a *Texas distributor or affiliate*." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 874 (Tex. 2010) (emphasis added). The Court briefly glosses the facts of *Spir Star*, noting that a foreign manufacturer "marketed its product through an independent" Texas distributor, and inexplicably concludes that "the same result obtains" here. *Ante* at 27–28. But the Court's cursory reading of *Spir Star* never grapples with the facts we relied on to support the exercise of personal jurisdiction based on the German manufacturer's direct purposeful availment of Texas in that case:

- the German manufacturer's "whole board [of directors]" decided that Houston would be the best place to set up a distributorship for its energy-related products "because of the immediate vicinity of all the refineries";

- the German manufacturer's leadership traveled to Houston to set up the distributorship and later signed the Texas entity's formation documents there; and

- the same person served as president of both the German manufacturer and the Texas distributor and spent "half the year working in Houston."

310 S.W.3d at 871, 877.

Not one of the direct Texas-specific contacts we relied on in *Spir Star* is present in this case. The German manufacturers did not create a "Texas distributor or affiliate." *Id.* at 874. Indeed, VW America is a New Jersey corporation headquartered in Virginia. The German manufacturers did not send any of their employees to Texas to set up or operate their U.S. distributorship or to cultivate business in Texas. *See*

22

*LG Elecs., Inc. v. Lovers Tradition II, LP*, No. 05-19-01304-CV, 2020 WL 4281965, at *19 (Tex. App.—Dallas July 27, 2020, pet. dism'd by agr.) (holding a foreign manufacturer that sold its products to a U.S. distributor was not subject to personal jurisdiction in Texas because "unlike in *Spir Star*, there [was] no indication in the record that [the manufacturer], its principals, or representatives came specifically to Texas"). And, unlike in *Spir Star*, the German manufacturers here maintain completely separate management, boards of directors, and employees from their U.S. distributor, VW America. *See Elk River*, 222 S.W.3d at 782 (declining to exercise personal jurisdiction over a manufacturer where, among other things, it did not share management with its distributor). The lesson to be drawn from *Spir Star* is that the plus-factor requirement is satisfied when a foreign manufacturer intentionally targets the Texas market by creating a *Texas* entity that would serve as a distributor *in Texas* and sends its own employees to work toward its goal of exploiting the *Texas* energy market.[11] 310 S.W.3d at 871. The facts in this case bear no resemblance to *Spir Star*. The record shows there was no purposeful availment of Texas by the German manufacturers because, unlike in *Spir Star*, the German manufacturers themselves had no direct contacts with Texas.

---

[11] The Court describes the German manufacturers' conduct here as "[a]nalogous" to the conduct in *Spir Star* and *Luciano*, *ante* at 28, while acknowledging that the facts in those cases "differ from the German manufacturers' contacts in this case." *Id.* at 51. But here, there is no fact that even comes close to serving as an analogous Texas contact. Texas courts have distinguished *Spir Star* on the same basis. *See LG Elecs.*, 2020 WL 4281965, at *19 (noting that, unlike in *Spir Star*, there was no evidence that the defendant established a Texas distributor to take advantage of the Texas market).

23

The Court also relies heavily on our recent decision in *Luciano*. But *Luciano* merely reaffirmed *Spir Star*'s key holding: a nonresident manufacturer is not shielded from suit in Texas by using a "Texas distributor or affiliate" to "*specifically target[] Texas* as a market for its products." *Luciano*, 625 S.W.3d at 11–12 (emphasis added) (quoting *Spir Star*, 310 S.W.3d at 874). And yet the Court co-opts *Luciano* to support its holding, ignoring that *Luciano* involved numerous direct Texas-specific contacts that are simply absent here. The Connecticut manufacturer in that case

- purposefully acquired and used a "Texas distribution center," which it frequently contacted and "made arrangements for some of its products to be stored there" before being sent to customers;

- retained a commission-based "sales agent" and "sold through him for a period of time . . . in the State of Texas"; and

- sent the sales agent to the plaintiffs' home *in Texas* "to investigate the alleged failure of its product by conducting testing and taking photographs on behalf of" the manufacturer.

*Luciano*, 625 S.W.3d at 10–12.

The facts of this case align with *Luciano* no more than with *Spir Star*. The German manufacturers here never created a Texas distribution center. The German manufacturers did not own any dealerships or have any sales agents acting on their behalf in Texas, nor did they set Texas-specific sales objectives for VW America. And unlike *Luciano*, where the manufacturer deployed its sales agent to Texas to assess the damage in the plaintiffs' home, the German manufacturers never sent any employees to Texas to carry out the recall campaign.

24

The Court sidesteps the glaring absence of analogous Texas contacts in this case and, despite the differences between this case and *Spir Star* and *Luciano*, concludes that the German manufacturers purposefully targeted the Texas market by engaging in conduct that was a necessary precursor to VW America's Texas contacts. The Court finds the exercise of jurisdiction proper because the German manufacturers

- "developed the tampering software";

- "caused the . . . software to be uploaded to 'mirror servers'"; and

- "had the sole authority to initiate and direct after-sale recall and service campaigns."

*Ante* at 22. Because all of this happened in Germany, it is no basis for asserting it constitutes purposeful availment of Texas. The German manufacturers indisputably developed the tampering software used in the recall campaign *in Germany*. And they uploaded it to a server *in Germany*. None of this conduct can be said to have targeted Texas. Only later did *VW America* access the software in the U.S. and distribute it to the local dealers throughout the entire U.S. market, including Texas. And VW America did this only because *VW America* had decided to place dealerships in Texas in the first instance. These facts do not support a conclusion that the German manufacturers "purposefully targeted the Texas market." *See Luciano*, 625 S.W.3d at 18; *see also TV Azteca*, 490 S.W.3d at 46 (endorsing the U.S. Supreme Court's plurality opinion in *Nicastro* that a defendant is subject to personal jurisdiction "only where the defendant can be said to have targeted the forum" (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (plurality op.))).

25

The Court cites no authority to support its conclusion that a foreign car manufacturer is subject to personal jurisdiction in a state in which its U.S. distributor does *not* reside merely because the foreign manufacturer directed its U.S. distributor to conduct a nationwide recall. Indeed, the only federal court to consider this precise issue explicitly rejects that conclusion. *See Thornton v. Bayerische Motoren Werke AG*, 439 F. Supp. 3d 1303, 1311 (N.D. Ala. 2020).

The claims in *Thornton* arose from injuries the plaintiff, Thornton, suffered in a car accident. *Id.* at 1306. She sued BMW AG, a German entity, and BMW NA, its "indirect subsidiary" and "exclusive distributor for new vehicles in the United States," *id.* at 1308, claiming her injuries were exacerbated by her car's defective driver-side front airbag. BMW had previously issued a recall on passenger-side front airbags but did not issue a recall for the driver-side airbag until several months after Thornton's accident. *Id.* at 1307. Thornton argued that the court could assert personal jurisdiction over BMW AG because (1) it "does business in the United States, including Alabama, as BMW Group" and BMW Group "marketed and sold vehicles" in the state; (2) it "made the decision as to how and when to issue a recall" and "thus exert[ed] continued control over all of the vehicles subject to the recall in the State of Alabama"; and (3) it was "the alter ego of BMW NA." *Id.* at 1310–12.

The court summarily rejected Thornton's arguments. It first concluded that BMW Group served as a name for the group of BMW AG's subsidiaries, including BMW NA, and it could not simply assume that BMW AG does business as any of those subsidiaries. *See id.*

26

at 1310–11; *accord BMC Software*, 83 S.W.3d at 798 (explaining that a court generally cannot impute a corporation's "doing business" in Texas to its parent or subsidiary since "Texas law presumes that two separate corporations are indeed distinct entities"). The court noted that even if BMW AG was doing business as BMW Group, there was insufficient evidence to show it "specifically target[ed] Alabama" as opposed to targeting the U.S. market as a whole. *Thornton*, 439 F. Supp. 3d at 1311; *see also Rickman v. BMW of N. Am. LLC*, 538 F. Supp. 3d 429, 439 (D.N.J. 2021) (holding a New Jersey court could not assert personal jurisdiction over a company that developed deceptive recall software in Germany where it had only exhibited "general efforts to target [the] U.S. market"). The court next held that BMW AG's alleged control over the nationwide recall did not support the exercise of jurisdiction over it in Alabama. *Thornton*, 439 F. Supp. 3d at 1311. Finally, the court rejected Thornton's alter-ego theory. *Id.* at 1312 ("[T]he evidence submitted by Thornton does not establish that BMW AG does business as BMW Group, much less that by purportedly doing so, BMW AG has complete control and domination over BMW NA's finances, policies, and business practices."). At every turn and in every respect, *Thornton* forecloses the State's arguments in this case.

In short, the authorities on which the Court relies can be said to support the exercise of jurisdiction in this case only if one ignores the substantial direct Texas-specific contacts of the nonresident defendants in those cases. No such contacts evidencing purposeful availment of Texas exist here.

**C.    The German manufacturers did not target Texas by targeting the U.S. as a whole.**

The Court also gravely misinterprets *Nicastro*, a far better analog to this case than *Spir Star* or *Luciano*. *Nicastro* involved a foreign manufacturer selling its products through a U.S. distributor. And like here, once the manufacturer sold its products to the U.S. distributor, it did not control their distribution within the United States. *Nicastro*, 564 U.S. at 878. After the plaintiff injured himself using one of the manufacturer's machines in New Jersey, he sued in New Jersey state court. *Id.* The New Jersey Supreme Court held that New Jersey could exercise jurisdiction over the foreign manufacturer in part because the manufacturer knew its products might end up there by way of its distributor's nationwide distribution system. *Id.* at 879.

The U.S. Supreme Court reversed. *Id.* at 887. In doing so, Justice Kennedy's plurality opinion recognized two key principles. First, "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis." *Id.* at 884. Second, and as a corollary to the first, "a defendant may . . . be subject to the jurisdiction of the courts of the United States but not of any particular State." *Id.* Justice Kennedy noted the relative rarity of that scenario given that foreign defendants "often target or concentrate on particular States," thus "subjecting them to specific jurisdiction in those forums." *Id.* at 885. Applying those principles, the plurality concluded that the New Jersey Supreme Court erred in holding that it could maintain personal jurisdiction over the foreign manufacturer. *Id.* at 886. The manufacturer may have (1) targeted the U.S. market generally, thus subjecting itself "to the jurisdiction of the courts of the United States"; or (2) "target[ed] or

28

concentrate[d] on particular States" by attending trade shows in select states, though not New Jersey, thus "subjecting [it] to specific jurisdiction in those forums." *Id.* at 884–86. But neither of those facts permitted New Jersey to exercise personal jurisdiction over the manufacturer. *See id.* at 886. The same is true with respect to Texas here.

The Court purports to apply the principles enunciated in Justice Kennedy's *Nicastro* opinion but concludes that this case is different from *Nicastro* in ways that support the exercise of personal jurisdiction. The Court says that while *Nicastro* "repudiated the . . . aggregation of nationwide contacts and attribution of those contacts to a particular state based on the foreign manufacturer's desire to penetrate the entire U.S. market," this case is different because the German manufacturers "seek to *negate* forum contacts based on their similar contacts elsewhere." *Ante* at 39. But that is a strawman that mischaracterizes the German manufacturers' position. They do not claim they can avoid jurisdiction in Texas *because* of their purposeful contacts with other states. They argue, rather, that this Court's precedents require a defendant to engage in specific conduct evincing purposeful targeting of Texas, regardless of the nature and extent of their contacts with other states. The German manufacturers note they have been subject to personal jurisdiction in federal court and in other states, like Virginia and California, only to *contrast* their purposeful contacts with those jurisdictions and the lack thereof in Texas. For instance, VW Germany's employees specifically traveled to Virginia to carry out the recall scheme. *See In re Volkswagen "Clean Diesel" Litig.*, No. CL-2016-9917,

2018 WL 4850155, at *3–4 (Va. Cir. Ct. Oct. 4, 2018) (order denying motion to dismiss) (noting the "strongest allegations" in favor of maintaining personal jurisdiction over the German manufacturers was that they sent their employees to Virginia and "created the false advertising content" at VW America's "corporate headquarters in Fairfax").

The Court next claims that *Nicastro* is "further inapposite because, here, the German manufacturers' conduct rises above mere foreseeability." *Ante* at 39. The Court says that by directing VW America to carry out the nationwide recall campaign for "specifically identified vehicles," the German manufacturers "intentionally reached into this market with certainty that the fraudulent campaigns would be carried out" here. *Id.* at 41. I cannot agree that the German manufacturers "intentionally reached" into Texas by providing VW America with a list that included the VIN for every vehicle to be recalled *in the United States*.[12] *See Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th

---

[12] We recognized a similar principle in another special-appearance case last term. There, a Texas plumbing installer and homebuilder sued a pipe manufacturer and an engineering firm after installing plastic pipes in thousands of Texas homes, resulting in water damage. *In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 674–75 (Tex. 2022). Jana, the engineering firm, contested personal jurisdiction, and the plaintiffs sought discovery relating to Jana's "studies, tests, investigations, and assessments" of how the plastic pipe performed "in field conditions in Texas." *Id.* at 675. We cautioned that these topics would be discoverable only if essential to prove specific jurisdiction and that, in turn, they would support jurisdiction only to the extent they "are tied to Jana's intent to *target the market in Texas*." *Id.* at 680 (emphasis added). We further explained that "mere general awareness of a range of conditions within which a product must operate *does not itself show a purpose to serve all markets in which those conditions exist*." *Id.* (emphasis added). Likewise, the German manufacturers' "general awareness" that VW

30

783, 787 (5th Cir. 2021) (rejecting a "greater includes the lesser" theory and reaffirming the need for specific targeting of the forum state). The list neither organized the information by state nor identified any specific vehicles as being *in Texas*. Of course, like the Court's characterization of the manufacturer in *Nicastro*, the German manufacturers "might have foreseen—and even hoped" that some of the cars they sold to VW America had made their way into Texas, just as it knew its cars would likely make their way to *every* state. *Ante* at 40. But the German manufacturers' mere knowledge that some of its cars were in Texas does not amount to purposeful availment. *See Luciano*, 625 S.W.3d at 13 ("'[M]ere knowledge' that a product is 'to be sold and used in Texas,' does not—without more—show purposeful availment." (quoting *CMMC v. Salinas*, 929 S.W.2d 435, 439 (Tex. 1996))); *Searcy*, 496 S.W.3d at 69 ("Even if a nonresident defendant *knows* that the effects of its actions will be felt by a resident plaintiff, that knowledge alone is insufficient to confer personal jurisdiction over the nonresident.").

I recognize the Court is not bound by Justice Kennedy's plurality opinion in *Nicastro*. *See Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013) ("The reasoning of a Supreme Court opinion that does not command a majority vote is not binding precedent."). But we have twice cited it with approval and indicated that we require purposeful targeting of Texas, which—as *Nicastro* explains—is distinct from targeting the U.S. market *as a whole*. *See Luciano*, 625 S.W.3d at

---

America sold vehicles to every state in the United States does not demonstrate the German manufacturers' targeting of every market in which those cars are located.

31

13 (citing the plurality opinion in *Nicastro* for the proposition that the "exercise of jurisdiction is permitted . . . only when the defendant targets the forum"); *TV Azteca*, 490 S.W.3d at 46 (quoting the *Nicastro* plurality's statement that a defendant is subject to personal jurisdiction "only where the defendant can be said to have targeted the forum"). And our courts have faithfully applied the *Nicastro* rule. *See, e.g.*, 2020 WL 7640037, at *5 ("[I]n determining whether a state court can exercise jurisdiction over a foreign defendant, only the defendant's purposeful contacts with the state, not with the United States, are relevant."); *Skylift*, 2020 WL 1879655, at *7 ("While Skylift sells its products throughout the United States, a nationwide distributorship, without more, is insufficient to confer specific jurisdiction over a manufacturer as a matter of due process.").

If the Court wishes to repudiate the *Nicastro* plurality opinion, it should do so explicitly and make Texas law clear. *See* 2020 WL 7640037, at *11 (Triana, J., dissenting) ("I would not adopt the *Nicastro* plurality's reasoning in this case . . . ."); *Ainsworth*, 716 F.3d at 178 (applying Justice Breyer's concurring opinion in *Nicastro* based on the *Marks* rule, which counsels lower courts to consider "the holding of the Court . . . as that position taken by those Members who concurred in the judgments on the narrowest grounds" (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation omitted))). Instead, it misreads *Nicastro* and muddies our personal-jurisdiction jurisprudence by announcing a new rule: any defendant that conducts a *nationwide* recall is subject to personal jurisdiction in Texas courts, even when none of the defendant's conduct targets Texas. I cannot endorse this clear departure

from our *own* precedents. *See Grapevine Excavation, Inc. v. Md. Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000) ("Adhering to precedent fosters efficiency, fairness, and legitimacy. More practically, it results in predictability in the law, which allows people to rationally order their conduct and affairs." (citations omitted)).

I sympathize with the Court's desire to hold the German manufacturers responsible for their admitted fraud.[13] But, as discussed in the next section, eroding constitutional protections set by well-established personal-jurisdiction precedents is not the answer. *See Michiana*, 168 S.W.3d at 791 (noting that "[j]urisdiction cannot turn on whether a defendant denies wrongdoing"); *see also Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996) ("[L]iability is not to be conflated with amenability to suit in a particular forum.").

## D. The intentional nature of the German manufacturers' conduct does not support the exercise of jurisdiction given the lack of purposeful targeting of Texas.

The Court asserts that the fact that the German manufacturers' conduct was intentionally tortious "heightens the quality of their contacts with this forum" such that the German manufacturers fall within Texas's jurisdiction. *Ante* at 42. In doing so, it relies primarily on a single line of dicta in the same *Nicastro* plurality opinion it painstakingly seeks to distinguish. Justice Kennedy noted "[t]here *may*

---

[13] The German manufacturers have already paid handsomely for concocting this scheme. The Court notes Dieselgate has cost them over $20 billion. A significant amount of this has been allocated to the State ($209 million), Texas dealers ($92 million), and Texas consumers ($1.45 billion).

be exceptions [to the purposeful-availment standard] in cases involving an intentional tort." *Nicastro*, 564 U.S. at 877–78 (emphasis added). That case, of course, did not involve an intentional tort. *Id.* at 878. And I am not inclined to alter the purposeful-availment standard based on a pontification about an exception the U.S. Supreme Court *may* someday recognize when this Court has explicitly held that Texas's interest in protecting against torts does not change the purposeful-availment analysis. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013) (stating "a forum's interest in protecting against torts . . . cannot displace the purposeful availment inquiry"); *see also Michiana*, 168 S.W.3d at 792 (rejecting the notion that "specific jurisdiction turns on whether a defendant's contacts were tortious rather than the contacts themselves").

The Court also relies on *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), in which the plaintiff, Keeton, claimed to have been libeled by a publisher that distributed a magazine nationwide. *Id.* at 772. Although she resided in New York, Keeton sued in New Hampshire because it was the only state where her suit would not have been time-barred. *Id.* at 773. The publisher's only contacts with New Hampshire were monthly sales of "some 10 to 15,000 copies" of the magazine, which comprised "only a small portion" of the copies circulated in the U.S. *Id.* at 772, 775. The First Circuit held that these contacts were too attenuated to assert personal jurisdiction over the publisher in New Hampshire. *Id.* at 773.

The Supreme Court reversed, holding that New Hampshire could exercise personal jurisdiction over the publisher. *Id.* The Court

concluded that Hustler "continuously and deliberately exploited the New Hampshire market" by selling its magazines in the state and thus could "reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at 781. In doing so, the Court rejected the court of appeals' reliance on the fact that such a small proportion of the total magazine sales occurred in New Hampshire. *See id.* at 773.

The Court analogizes the "some 10 to 15,000 copies" sold by Hustler Magazine in New Hampshire to the thousands of Volkswagen and Audi vehicles that made their way to Texas through the stream of commerce, noting that *Hustler* did not differentiate the New Hampshire magazine sales from the larger number of sales in other states. *See ante* at 35–36. The Court bolsters its point by citing *Luciano*, where we glossed *Hustler* for the proposition that "the contacts an entity forms with one jurisdiction do not negate its purposeful contacts with another." *Id.* at 34 (quoting *Luciano*, 625 S.W.3d at 10). Accordingly, the Court concludes that Texas can maintain personal jurisdiction over the German manufacturers "[e]ven if the German manufacturers were not subjectively focused on Texas to the exclusion of other jurisdictions." *Id.* at 36.

The Court's analysis ignores a critical distinction between *Hustler* and this case: the defendant in *Hustler* consciously "chose to enter the New Hampshire market" and facilitate thousands of *direct sales* of its magazine in the state, just like it did in other states. 465 U.S. at 779. This case does not involve any direct sales by the German manufacturers to Texas. *Hustler* thus has little application here, where

the German manufacturers targeted the U.S. market as a whole and the sales to Texas (and, later, a nationwide recall) were carried out by a separate entity, which has acknowledged it is subject to jurisdiction in Texas.

## III.    Conclusion

Our precedents establish that a defendant may be subject to specific personal jurisdiction in Texas only if it purposefully targeted the Texas market. All agree that the German manufacturers directed their activity toward the U.S. as a whole. But the Court wrongly concludes that is sufficient to prove the German manufacturers targeted Texas in particular.

The Court's divergence from well-established personal-jurisdiction precedents will have significant ramifications for consumers in our state. A manufacturer wishing to sell its product in Texas can avoid personal jurisdiction in Texas courts by structuring its business in a way that avoids purposeful targeting of Texas. But should the same manufacturer wish to take post-sale action relating to the *same* product, it faces a catch-22: (1) direct its U.S. distributor to carry out a recall, and thus subject itself to personal jurisdiction under the Court's new rule; or (2) decide not to order a recall for fear of being subject to jurisdiction in Texas courts. The Court's new rule creates a perverse incentive for a manufacturer that knows it should address a product concern to instead roll the dice on Texans' safety.

I conclude the court of appeals correctly held, consistent with U.S. Supreme Court precedents and our own cases, that the German manufacturers' conduct is insufficient to assert personal jurisdiction

36

over them in Texas. Accordingly, I would affirm the court of appeals' judgment. Because the Court does otherwise, I respectfully dissent.

Rebeca A. Huddle
Justice

**OPINION FILED:** May 5, 2023